# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

***Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505**

---

| | |
|---|---|
| Caption in Supreme Court: | GARY PALM, Appellee, v. 2800 LAKE SHORE DRIVE CONDOMINIUM ASSOCIATION *et al.*, Appellants. |
| Docket No. | 110505 |
| Filed | April 25, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A conflict between a home rule ordinance and a state statute does not render the ordinance invalid or beyond constitutional home rule authority, and if the legislature wishes to preempt a home rule power, it must do so specifically—city ordinance on production of condominium records upheld. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Sophia H. Hall, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Mark D. Roth, of Orum & Roth, LLC, of Chicago, for appellants. |
| | |
| | Gary H. Palm, of Chicago, appellee *pro se.* |
| | |
| | Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper and Christopher S. Norborg, of counsel), for intervenor-appellee. |
| | |
| Justices | CHIEF JUSTICE KILBRIDE delivered the judgment of the court, with opinion. |
| | Justices Garman, Karmeier, and Theis concurred in the judgment and opinion. |
| | Justice Thomas specially concurred, with opinion. |
| | Justice Freeman dissented, with opinion, joined by Justice Burke. |

## OPINION

¶ 1    The primary issue in this appeal is whether a City of Chicago ordinance allowing condominium unit owners to inspect condominium association financial books and records is a valid exercise of the City's home rule power. We affirm the appellate court's holding that the City's ordinance is valid and enforceable. We also affirm the appellate court's decision that the trial court did not err in awarding the plaintiff interim attorney fees.

¶ 2                          I. BACKGROUND

¶ 3    Plaintiff Gary Palm owns a unit in the 2800 Lake Shore Drive condominium building in Chicago. He served on the board of directors of the condominium association from 1992 to 1998.

¶ 4    On September 15, 1999, Palm sent a letter to the president of the Association board of directors asking for production of specific documents and records related to the building's management. Palm explained that he needed the documents to investigate the board's actions, including whether: (1) the board awarded contracts improperly; (2) the board used improper investment and banking practices; (3) the board held unlawful private meetings; (4) board president Kay Grossman used Association funds without proper approval; (5) the 1998 board election was compromised by "irregularities or improprieties"; and (6) legal action should have been pursued against the builder.

¶ 5    When his request was denied, Palm filed a complaint seeking to examine, inspect, and copy the documents. The Association moved to dismiss the complaint, and the circuit court of Cook County dismissed it without prejudice.

¶ 6 Palm then filed a four-count first amended complaint. In count IV, the only claim at issue in this appeal, Palm challenged the denial of his request for production of documents. Palm sought an order compelling production of the documents under various laws, including a provision of the City's condominium ordinance. The ordinance allows condominium unit owners to inspect a condominium association's financial books and records within three business days of delivering a written request to examine the records. Chicago Municipal Code § 13-72-080 (2009).

¶ 7 The Association moved to dismiss the complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2000)). On December 11, 2000, the trial court granted the motion to dismiss all four counts of the complaint, ruling that section 107.75 of the General Not For Profit Corporation Act of 1986 (805 ILCS 105/107.75 (West 2000)) preempted the City's ordinance and Palm was not entitled to the requested documents under that statute. The trial court allowed Palm 14 days to file a second amended complaint.

¶ 8 On December 19, 2000, Palm filed a motion to reconsider the dismissal of his first amended complaint. The City petitioned to intervene to defend the validity of its ordinance and submitted a brief in support of Palm's motion to reconsider. The trial court allowed the City to intervene.

¶ 9 The trial court entered an order on April 3, 2001, stating it had reconsidered the previous dismissal order. The trial court dismissed with prejudice counts I, II, and III of the first amended complaint. Count IV was dismissed without prejudice and Palm was given until April 17, 2001, to file a second amended complaint. The trial court denied the City's request for a finding under Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 1, 1994)) that there was no just reason to delay an appeal.

¶ 10 On April 17, 2001, Palm filed a motion to reconsider the order entered on April 3, 2001. A new trial judge was assigned due to the retirement of the original judge. The trial court granted Palm's motion in part, vacating the dismissal of count IV based on its finding that the City's ordinance was a valid exercise of its home rule authority and the ordinance was not preempted by a state statute. The Association's motion to dismiss was, therefore, denied.

¶ 11 The trial court later granted in part Palm's motion for summary judgment on count IV of his complaint. The Association was ordered to produce the requested documents as required by the City's ordinance.

¶ 12 Palm petitioned for an award of interim attorney fees, alleging that as the prevailing party he was entitled to fees under the ordinance. Palm submitted that $300 per hour was reasonable and appropriate. He acknowledged that he paid his attorney in accordance with a fee agreement at a rate of $200 per hour, but claimed it was a reduced rate. He asserted that when attorney fees are recoverable under a statute, it is typical for a fee agreement to provide for a reduced hourly rate with reasonable attorney fees determined upon completion of the case.

¶ 13 Palm's petition further alleged that the fee award would be retained by his attorney. According to the petition, Palm would receive no part of the award other than reimbursement of his actual payments to his attorney. Palm submitted an affidavit of retired Cook County Circuit Court Judge Kenneth L. Gillis, asserting that the rate of $300 per hour was "well

within the prevailing market rates charged in comparable cases by Chicago attorneys of similar qualifications, skill and experience."

¶ 14    On August 26, 2008, the trial court granted Palm's interim fee petition under the ordinance. Palm was awarded attorney fees at the rate of $300 per hour. The trial court certified for immediate appeal under Supreme Court Rule 304(a) the order granting Palm partial summary judgment on count IV of his complaint and the award of interim attorney fees.

¶ 15    The appellate court held that the Chicago ordinance authorizing inspection of the Association's records was a valid exercise of the City's home rule power and the trial court did not abuse its discretion in entering the award for interim attorney fees. Accordingly, the appellate court affirmed the trial court's judgment. 401 Ill. App. 3d 868.

¶ 16    We allowed the defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 17                                    II. ANALYSIS

¶ 18                                   A. Jurisdiction

¶ 19    First, we identified a potential jurisdictional issue in our initial review of the briefs in this case. The briefs describe a complicated procedural background suggesting that the trial court may have entered a final judgment on April 3, 2001. The briefs indicate that the April 3, 2001, order denied the motion to reconsider the dismissal of the first amended complaint. According to the briefs, that order was followed by a second motion to reconsider filed more than 30 days later on May 8, 2001.

¶ 20    The jurisdictional concerns were raised by this court during oral argument, and we subsequently entered an order allowing the parties to file supplemental briefs addressing whether the circuit court lost jurisdiction before entering the orders subject to this appeal. The parties filed supplemental briefs clarifying that the April 3, 2001, order dismissed count IV without prejudice and with leave to refile. The parties assert that the order was not a final judgment subject to appeal and the trial court never entered a final order dismissing count IV of the first amended complaint. The parties, therefore, agree that the trial court did not lose jurisdiction before entering the orders subject to appeal in this case.

¶ 21    The jurisdictional concerns that arose in our initial review of this case centered on whether the April 3, 2001, order constituted a final judgment. A civil ruling is final if it terminates the litigation and fixes the parties' rights leaving only enforcement of the judgment. *In re Detention of Hardin*, 238 Ill. 2d 33, 42-43 (2010). A review of the record confirms that the April 3, 2001, order dismissed count IV of the first amended complaint without prejudice and with leave to refile. An order dismissing a complaint with leave to amend is not a final judgment. See *Smith v. Central Illinois Regional Airport*, 207 Ill. 2d 578, 585-87 (2003). The order did not terminate the litigation or fix the parties' rights. Additionally, the order was subject to reconsideration by the trial court at any time prior to entry of a final judgment. See *Towns v. Yellow Cab Co.*, 73 Ill. 2d 113, 119-21 (1978). Thus, after reviewing the record, we agree with the parties that the trial court did not lose jurisdiction before entering the orders subject to this appeal.

¶ 22                                B. Validity of Ordinance

¶ 23        The central issue in this appeal is whether the Chicago ordinance allowing condominium unit owners access to association financial books and records is a valid exercise of the City's home rule power.[1] The defendants contend that the ordinance conflicts with and renders unenforceable within the City of Chicago portions of the Condominium Property Act (765 ILCS 605/1 *et seq.* (West 2000)) and the General Not For Profit Corporation Act of 1986. Those statutes require condominium unit owners to state a proper purpose for obtaining association financial books and records, require production of only 10 years of records, and allow an association 30 days to gather and produce the records. Under the Chicago ordinance, a unit owner is not required to state a proper purpose for requesting the records, there is no restriction on the age of the documents, and the documents must be produced within three business days of the request. The defendants contend that the ordinance exceeds the City's home rule authority because it conflicts with the statutory provisions and renders them unenforceable. The defendants, therefore, maintain that the appellate court's judgment upholding the ordinance should be reversed.

¶ 24        Palm and the City contend that the General Assembly may limit home rule authority to regulate in a given field by expressly reserving that power for itself or prohibiting home rule units from exercising that power. They contend that in rare cases involving interference with a vital state interest, this court has intervened to compensate for legislative inaction or oversight and preempted the exercise of home rule authority. This court has intervened, however, only in cases involving environmental regulations based on specific language in the Illinois Constitution establishing the state's supremacy in that field. The legislature has not specifically limited the authority of home rule units to regulate condominiums or reserved that power for itself, and the state does not have a vital interest in regulating condominiums necessary to justify preemption of the City's ordinance. Accordingly, Palm and the City contend that the appellate court's judgment should be affirmed.

¶ 25        Palm also asserts that in response to his September 15, 1999, letter requesting production of documents, the Association's attorney provided a copy of a monthly income-expense report with a letter claiming to comply with the ordinance. Palm contends that the letter claiming to comply with the City's ordinance constitutes a waiver of any challenge to the validity of the ordinance. Palm does not cite any authority in support of his claim.

¶ 26        Waiver is the "intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) *People v. Phipps*, 238 Ill. 2d 54, 62 (2010) (quoting *People v. Blair*, 215 Ill. 2d 427, 444 n.2 (2005), quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). In contrast, forfeiture applies when an issue is not raised in a timely manner. Waiver is, therefore, distinct from forfeiture. *People v. Houston*, 229 Ill. 2d 1, 9 n.3 (2008).

¶ 27        Palm has not established that the defendants intentionally relinquished or abandoned their claim that the ordinance exceeds the City's home rule power. The letter from the

---

[1]The defendants do not raise any issue on the construction of the ordinance or whether the documents requested by Palm were subject to production under the terms of the ordinance. The appeal is limited to whether the ordinance is a valid and enforceable exercise of home rule power.

Association's attorney purports to comply with the ordinance but does not make any statement relinquishing or abandoning any challenge to the ordinance. The letter does not even mention or recognize the availability of a potential claim under the home rule provisions of the Illinois Constitution. Accordingly, we conclude that the defendants did not waive their claim in this case.

¶ 28 The appeal in this case is from the trial court's entry of partial summary judgment ordering production of the requested documents under the City's ordinance. Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). We review *de novo* an order granting summary judgment. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 309 (2010).

¶ 29 Home rule is based on the assumption that municipalities should be allowed to address problems with solutions tailored to their local needs. *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 286 (2001). The home rule provisions of the 1970 Illinois Constitution were designed to alter drastically the relationship between our local and state governments. *City of Chicago v. Roman*, 184 Ill. 2d 504, 512 (1998). Article VII, section 6(a), of the Illinois Constitution provides:

"Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

¶ 30 Section 6(a) was written with the intention to give home rule units the broadest powers possible. *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992). The Illinois Constitution further provides that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m).

¶ 31 The General Assembly may, however, preempt the exercise of a municipality's home rule powers by expressly limiting that authority. *Schillerstrom Homes*, 198 Ill. 2d at 287; *Scadron*, 153 Ill. 2d at 185-86. Under article VII, section 6(h), the General Assembly "may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit." Ill. Const. 1970, art. VII, § 6(h). If the legislature intends to limit or deny the exercise of home rule powers, the statute must contain an express statement to that effect. *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 108 (1981) (citing *Stryker v. Village of Oak Park*, 62 Ill. 2d 523, 528 (1976)). If the legislature does not expressly limit or deny home rule authority, a municipal ordinance and a state statute may operate concurrently as provided in article VII, section 6(i):

"Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i).

¶ 32 Thus, the Illinois Constitution provides home rule units with the same powers as the sovereign, except when those powers are limited by the General Assembly. *Roman*, 184 Ill.

2d at 513 (citing *Triple A Services, Inc. v. Rice*, 131 Ill. 2d 217, 230 (1989)). Under section 6(i), home rule units may continue to regulate activities even if the state has also regulated those activities. *Schillerstrom Homes*, 198 Ill. 2d at 287-88. To restrict the concurrent exercise of home rule power, the General Assembly must enact a law *specifically* stating home rule authority is limited. *Scadron*, 153 Ill. 2d at 185-86. The General Assembly has codified that principle in section 7 of the Statute on Statutes (5 ILCS 70/7 (West 2010)), providing:

> "No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit."

Section 7 has been formally adopted as part of this court's home rule jurisprudence. *Schillerstrom Homes*, 198 Ill. 2d at 287.

¶ 33 Additionally, the legislature has enacted the Home Rule Note Act, providing "[e]very bill that denies or limits any power or function of a home rule unit shall have prepared for it before second reading in the house of introduction a brief explanatory note that includes a reliable estimate of the probable impact of the bill on the powers and functions of home rule units." 25 ILCS 75/5 (West 2010). Accordingly, the legislature has recognized its principal role in determining whether to preempt or limit home rule power and its responsibility to use specific language when preempting or limiting that power.

¶ 34 We have consistently recognized that the home rule provisions of the Illinois Constitution are intended to " 'eliminate or at least reduce to a bare minimum the circumstances under which local home rule powers are preempted by judicial interpretation of unexpressed legislative intention.' " *Scadron*, 153 Ill. 2d at 186 (quoting David C. Baum, *A Tentative Survey of Illinois Home Rule (Part II): Legislative Control, Transition Problems, and Intergovernmental Conflict*, 1972 U. Ill. L.F. 559, 571); see also *Schillerstrom Homes*, 198 Ill. 2d at 288; *Roman*, 184 Ill. 2d at 516. "The Illinois approach places almost exclusive reliance on the legislature rather than the courts to keep home rule units in line." (Internal quotation marks omitted.) *Roman*, 184 Ill. 2d at 517 (quoting *Scadron*, 153 Ill. 2d at 187-88). " '[I]f the constitutional design is to be respected, the courts should step in to compensate for legislative inaction or oversight *only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies*.' " (Emphasis in original.) *Scadron*, 153 Ill. 2d at 190 (quoting David C. Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 157).

¶ 35 Prior to our recent decision in *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, this court had used a three-part test to review the constitutionality of the exercise of home rule power. *Schillerstrom Homes*, 198 Ill. 2d at 289-90. Under that test, we first determined whether the disputed exercise of local government power pertains to local government and affairs as required under section 6(a). If so, we determined whether the General Assembly preempted the exercise of home rule powers in the area. If not, we determined the "the proper

relationship" between the local legislation and the state statute. *Schillerstrom Homes*, 198 Ill. 2d at 289-90.

¶ 36 The "vital state policy" analysis was treated as the third part of that test, to be considered after determining whether the local ordinance pertains to the home rule unit's government and affairs under section 6(a) and whether the legislature expressly preempted the exercise of home rule authority. *Roman*, 184 Ill. 2d at 512-19; *Scadron*, 153 Ill. 2d at 174-90. In *StubHub*, however, this court recognized that "the concept of a vital state policy trumping municipal power is analytically appropriate under section 6(a)" rather than section 6(i). *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶ 22 n.2. Accordingly, "[i]f a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, municipalities may exercise their power." *StubHub, Inc.*, 2011 IL 111127, ¶ 22 n.2. In those circumstances, the "proper relationship" between the local legislation and the state statute is established by section 6(i), providing that home rule units "may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i).

¶ 37 The defendants' brief specifically states no argument is raised on whether the City's ordinance pertains to local affairs or whether the legislature has expressly preempted home rule authority. In fact, in their reply brief the defendants criticize the City for addressing those parts of the home rule analysis because "those factors are not even at issue in this appeal." The defendants assert that "the only issue on appeal related to the enforceability of the City's ordinance *** is the third test ***[,] whether there is 'a proper relationship between the local ordinance and the state statute.' " The defendants contend that the City's ordinance is invalid because it renders unenforceable within Chicago portions of the Illinois Condominium Property Act and the General Not For Profit Corporation Act of 1986. The City's ordinance states:

> "No person shall fail to allow unit owners to inspect the financial books and records of the condominium association within three business days of the time written request for examination of the records is received." Chicago Municipal Code § 3-72-080 (2009).

Section 19 of the Condominium Property Act and section 107.75 of the General Not For Profit Corporation Act of 1986 require condominium unit owners to state a "proper purpose" for inspecting condominium financial books and records. 765 ILCS 605/19(e) (West 2000); 805 ILCS 105/107.75(a) (West 2000). Additionally, section 19 of the Illinois Condominium Property Act requires production of only the current and previous 10 years of financial books and records and allows 30 business days to produce those records. 765 ILCS 605/19(a)(9), (e) (West 2000).

¶ 38 The defendants assert that the City's ordinance directly conflicts with the statutory provisions because: (1) it does not require unit owners to state a proper purpose for inspecting financial books and records; (2) it does not limit production to a certain number of years; and (3) it contains a much shorter time period for producing the records. Relying on *Schillerstrom Homes*, the defendants argue that the ordinance exceeds the City's home

rule power given the direct conflict with the statutory provisions. The defendants contend that in *Schillerstrom Homes* this court upheld an ordinance only because it did not conflict with a state statute. The defendants, therefore, maintain that an ordinance exceeds home rule power if it conflicts with a state statute.

¶ 39 The defendants further contend that an ordinance may be a valid exercise of home rule power only if it is more restrictive than a state statute addressing the same subject. A more restrictive ordinance leaves the statute intact and enforceable. The defendants contend that the ordinance here is less restrictive than the statutes in granting access to association financial books and records. The ordinance, therefore, is invalid because it eliminates the statutory requirement of stating a "proper purpose" to obtain records, changes the scope of documents subject to production, and alters the time frame for producing those documents.

¶ 40 In *Schillerstrom Homes*, a real estate development company filed a complaint against the City of Naperville, alleging that the City willfully failed to approve the company's final subdivision plat within the 60-day period required by a state statute. *Schillerstrom Homes*, 198 Ill. 2d at 282-83. The company sought damages under the statutory remedy provision. *Schillerstrom Homes*, 198 Ill. 2d at 283. While the City's ordinance also set forth a 60-day period for plat approval and was "strikingly similar" to the statute, the ordinance was silent on a remedy for a violation of its provisions. *Schillerstrom Homes*, 198 Ill. 2d at 288-89. The dispute centered on whether the ordinance superseded the statutory remedy provision. *Schillerstrom Homes*, 198 Ill. 2d at 283.

¶ 41 In analyzing the issue, we considered whether the ordinance superseded the entire statute, including its remedy provision. See *Schillerstrom Homes*, 198 Ill. 2d at 291-93. We concluded that the ordinance, by remaining silent on the remedy, did not supersede or limit the remedy provision of the statute. *Schillerstrom Homes*, 198 Ill. 2d at 293. The statutory remedy provision simply filled the gap in the ordinance. *Schillerstrom Homes*, 198 Ill. 2d at 293. Importantly, we did not question whether the ordinance could supersede a conflicting state statute. Rather, we clearly accepted the basic principle that an ordinance may supersede or limit a conflicting statute. *Schillerstrom Homes*, 198 Ill. 2d at 291-93. We only held that the ordinance, by remaining silent, did not supersede the portion of the statute providing a remedy.

¶ 42 Contrary to the defendants' argument, the conflict between the City's ordinance and the state statutes here does not render the ordinance invalid or beyond home rule power. " 'The fact that the state has occupied some field of governmental endeavor, or that home rule ordinances are in some way inconsistent with state statutes, is not in itself sufficient to invalidate the local ordinances.' " *Scadron*, 153 Ill. 2d at 194 (quoting David C. Baum, *Tentative Survey of Illinois Home Rule (Part II): Legislative Control, Transition Problems, and Intergovernmental Conflict*, 1972 U. Ill. L.F. 559, 572). In holding that a statutory provision did not preempt an inconsistent home rule ordinance, this court has relied on Professor Baum's explanation that:

> " 'It may happen that a state statute and a home rule ordinance are in direct and immediate conflict and cannot reasonably stand together. ***
>
> *** Since the state always can vindicate its interests by legislating in the proper

form, it seems unwise to sustain state legislation at the expense of home rule ordinances except when a state statute is in the required form or in those few cases where vital state interests would be sacrificed by permitting the local legislation to prevail until the next session of the General Assembly.' " *Roman*, 184 Ill. 2d at 519 (quoting 1972 U. Ill. L.F. at 572-73).

¶ 43 Further, this court has never held that a home rule unit may only enact an ordinance more restrictive than statutory provisions. Instead, we have held that the General Assembly may limit or restrict a home rule unit's power by allowing local ordinances, but only within limits consistent with the statutory scheme. *Roman*, 184 Ill. 2d at 519. To limit or restrict home rule authority, however, the General Assembly must do so specifically. *Roman*, 184 Ill. 2d at 520. Comprehensive legislation that conflicts with an ordinance is insufficient to limit or restrict home rule authority. *Roman*, 184 Ill. 2d at 519-20.

¶ 44 In sum, the constitutional framework places almost exclusive reliance on the General Assembly to determine whether home rule authority should be preempted. *Roman*, 184 Ill. 2d at 517; *Scadron*, 153 Ill. 2d at 187-88. The legislature has not specifically denied the City's exercise of home rule power or required its exercise of that power to be consistent with statutory provisions. If the General Assembly wishes to deny or restrict the City's home rule authority, it may enact a statute expressly providing for that action at its next session. Accordingly, we conclude that the City's ordinance is a valid exercise of its home rule power.

¶ 45                                      C. Interim Attorney Fees Award

¶ 46 The defendants also contend that the trial court erred in awarding Palm attorney fees at the rate of $300 per hour when he agreed to pay and actually paid his attorney $200 per hour. The defendants contend that the City's ordinance only allows recovery of attorney fees actually incurred in an action to enforce the ordinance.

¶ 47 The City's ordinance provides the basis for awarding attorney fees in this case. Our review of the interim fee award, therefore, begins with interpreting the City's ordinance. See *Blum v. Stenson*, 465 U.S. 886, 892-93 (1984) (determining correct standard for calculating attorney fees award "begins and ends with an interpretation of the attorney's fee statute"); *Citizens Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 598-99 (2000) (interpreting fee-shifting provision in section 10-55(c) of the Illinois Administrative Procedure Act in accordance with its plain language).

¶ 48 The rules of statutory construction apply to the interpretation of municipal ordinances. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). The fundamental objective of statutory construction is to ascertain and give effect to the drafter's intent. *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262, 268 (2010). The statutory language, given its plain and ordinary meaning, is the best indication of legislative intent. *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010). We review questions of statutory construction *de novo*. *Ries v. City of Chicago*, 242 Ill. 2d 205, 216 (2011).

¶ 49 The City's ordinance provides, in pertinent part, that a prevailing plaintiff in an action brought to enforce an ordinance provision "shall be entitled to recover, in addition to any

other remedy available, his reasonable attorney fees." Chicago Municipal Code § 13-72-100 (2009). The ordinance, therefore, allows a prevailing plaintiff to recover or obtain reasonable attorney fees.

¶ 50   In *Blum*, the Supreme Court construed a federal statute with language similar to the City's ordinance allowing recovery of "reasonable attorney fees." The statute applicable in federal civil rights actions provided that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (Internal quotation marks omitted.) *Blum*, 465 U.S. at 888 (quoting 42 U.S.C. § 1988). The Court considered whether the statute required use of the prevailing market rate or a cost-based standard in calculating attorney fee awards. *Blum*, 465 U.S. at 892-93. Based on the statute and its legislative history, the Court concluded that "reasonable fees" were to be calculated in accordance with the prevailing market rates in the relevant community. *Blum*, 465 U.S. at 895.

¶ 51   The phrase "reasonable attorney fees" has generally been interpreted to require use of the prevailing market rate in calculating a fee award. See *Wisconsin v. Hotline Industries, Inc.*, 236 F.3d 363, 366 (7th Cir. 2000) (general rule for calculating fee awards under statutes authorizing a "reasonable attorney's fee as part of the costs" is to use the "prevailing market rates in the relevant community"). Thus, contrary to the defendants' argument, the language of the City's ordinance does not indicate that recoverable attorney fees are limited to those actually incurred or paid by the plaintiff in the litigation. Rather, use of the phrase "reasonable attorney fees" indicates an intent to allow recovery based on the prevailing market rate for the attorney's services.

¶ 52   Here, the trial court awarded interim attorney fees based on the market value of the attorney's services. The trial court, therefore, used the correct standard in calculating the attorney fees award under the ordinance. The trial court's award using the correct standard is reviewed for abuse of discretion. *Lurie v. Canadian Javelin Ltd.*, 93 Ill. 2d 231, 239 (1982).

¶ 53   In this case, Palm provided the only evidence on the prevailing market rate for the services of his attorney. Palm submitted the affidavit of retired Cook County Circuit Court Judge Kenneth L. Gillis, attesting that the rate of $300 per hour was "well within the prevailing market rates charged in comparable cases by Chicago attorneys of similar qualifications, skill and experience."

¶ 54   The defendants did not present any evidence on the prevailing market rate for the services of Palm's attorney. Instead, the defendants contend that the fee award at the prevailing market rate will result in a windfall to Palm and an award of exemplary damages against them because Palm will be allowed to keep the amount exceeding the $200 per hour he paid his attorney. The defendants, therefore, contend that the fee award allows Palm to profit from his challenge to the ordinance.

¶ 55   The defendants' argument is, nevertheless, contradicted by the allegations in Palm's petition for interim attorney fees. In his petition, Palm alleged that the fee agreement provided a reduced hourly rate that is typical in actions allowing recovery of attorney fees by a prevailing party. The petition further alleged that the fee award would be retained by

Palm's attorney and Palm would only receive reimbursement for his actual payments. Palm's attorney signed the petition, averring that she had personal knowledge of the allegations and could testify to the matters set forth in the petition. According to the verified petition, therefore, Palm will not receive a windfall from this action, but will only be reimbursed for his actual payments to his attorney. Palm's attorney will receive "reasonable attorney fees" based on the prevailing market rate as required by the City's ordinance.

¶ 56    Given this record, we cannot find that the trial court abused its discretion in setting the interim attorney fees award. The award is based on the only evidence presented on the prevailing market rate for the attorney's services. Accordingly, the trial court's award of interim attorney fees must be affirmed.

¶ 57                              III. CONCLUSION

¶ 58    For the foregoing reasons, we hold that the City's ordinance is a valid exercise of its home rule power and the interim attorney fees award is not an abuse of discretion. The appellate court's judgment is, therefore, affirmed.

¶ 59    Affirmed.

¶ 60    JUSTICE THOMAS, specially concurring:

¶ 61    I join the majority opinion. I write separately to address the dissent filed by Justices Freeman and Burke, in which the dissenting justices criticize the majority for not reversing the appellate court on an unargued and unbriefed basis. The dissent, unfortunately, causes great confusion about what issues are properly before the court, and it is off base in its discussion of both home rule and the proper role of a court of review.

¶ 62                       I. What Is at Issue in This Appeal

¶ 63    The argument made by the Association is straightforward and clear: a municipality may not enact an ordinance that is less restrictive than a state statute. The Association reads this state's case law as establishing a rule that home rule municipalities may enact ordinances that are *more* restrictive than state statutes, but not *less* restrictive. The argument section of the Association's brief contains eight pages of argument on this issue, and another seven pages on the attorney fees issue. That is it. Apparently unhappy with the way that the appellants framed their argument, the dissent has decided to make a different argument for them: that the ordinance does not pertain to the City's government and affairs.[2] The dissenting justices

---

[2]The vast majority of the dissent is spent addressing matters not in any way at issue. For instance, the dissent opens by demonstrating that the ordinance and the statute conflict. Of course they do; both sides concede this. If there was no conflict, we would not have this case. The dissent likewise spends a great deal of time tracing the history of condominium law in the United States. But this is in no way relevant to the Association's appeal. The Association raises a simple argument that does not require an examination of the history of condominiums: a home rule ordinance may not

contend that this court should reverse on this unargued and unbriefed basis. Although this court unquestionably has the *power* to do what the dissenting justices request, our established precedent dictates that we should not. We recently discussed this very issue in *People v. Givens*, 237 Ill. 2d 311 (2010). In that case, we explained why a reviewing court should not search the record for unargued reasons to reverse the lower court:

"Illinois law is well settled that other than for assessing subject matter jurisdiction, 'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment.' (Emphasis added.) *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978); see also *Parks v. McWhorter*, 106 Ill. 2d 181, 184 (1985) (noting that except for jurisdictional grounds, a search of the record for unargued and unbriefed reasons to reverse a lower court's decision is improper); *People ex rel. Akin v. Southern Gem Co.*, 332 Ill. 370, 372 (1928) ('while this court will examine the record for the purpose of affirming a judgment it will not do so for the purpose of reversing it'). Moreover, in *Greenlaw v. United States*, 554 U.S. 237, 243, 171 L. Ed. 2d 399, 408, 128 S. Ct. 2559, 2564 (2008), the United States Supreme Court recently addressed the propriety of a reviewing court ruling upon issues raised *sua sponte*. The Court admonished:

'In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a *pro se* litigant's rights. [Citation.] But as a general rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." [Citation.] As cogently explained:

"[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do ***." [Citation.]' *Greenlaw*, 554 U.S. at 243-44, 171 L. Ed. 2d at 408, 128 S. Ct. at 2564.

Our appellate court in *People v. Rodriguez*, 336 Ill. App. 3d 1, 14 (2002), expressed a similar sentiment as follows:

'While a reviewing court has the power to raise unbriefed issues pursuant to Supreme Court Rule 366(a)(5), we must refrain from doing so when it would have the effect of transforming this court's role from that of jurist to advocate.

---

conflict with a state statute in such a way that it is less restrictive than the statute. And this argument, the only preemption issue before the court, is never mentioned or addressed by the dissent. Thus, one wonders what the dissent means when it opens by stating the majority opinion is an "unnecessary departure" from settled condominium property law, when the majority opinion does not address condominium law at all. The majority opinion is limited to the issues before the court.

-13-

[Citation.] Were we to address these unbriefed issues, we would be forced to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court. To engage in such speculation would only cause further injustice; thus we refrain from addressing these issues *sua sponte*.' " *Givens*, 237 Ill. 2d at 323-24.

¶ 64    And, here, the problem goes beyond mere forfeiture. Not only did the appellants not raise this argument, they criticized the City for even mentioning it. As noted by the dissent, the City did a complete analysis of every possible preemption argument that the Association could make, and demonstrated that the Association would lose on every one. In its reply brief, the Association stated the following:

> "The *Schillerstrom* court noted that there are three tests for determining enforceability of a home rule ordinance. The first two tests are whether the ordinance pertains to local affairs, and whether a state statute expressly preempts home rule power. Although the City devotes the vast majority of its brief to those first two issues, *those factors are not even at issue in this appeal*." (Emphasis added.)

So, according to the dissent, this court should grant relief to the appellants on the basis of an argument that they criticized the appellee for even mentioning.

¶ 65    The dissent offers several reasons why the normal rules of appellate procedure do not apply to this case, but none are convincing. First, without citation to authority, the dissent claims that the issue is "squarely and properly before the court" (*infra* ¶ 96 (Freeman, J., dissenting, joined by Burke, J.)) because the City addressed it in its *appellee's* brief. I direct my dissenting colleagues' attention to Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013), which contains the requirements for an appellant's brief and provides that: "Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Thus, the scope of the Association's appeal was framed when it filed its opening brief.

¶ 66    Second, the dissent argues that the question of whether a matter pertains to local government and affairs under section 6(a) is a legal one, and thus this court is not bound to abide by the parties' contentions. While I do not disagree with the dissent's premise, its conclusion is a non sequitur. Had the Association properly raised a section 6(a) issue, I agree that this court would not be bound by the parties' precise legal contentions on that issue. I do not see, however, how a section 6(a) question being a legal one excuses the Association's complete failure to raise the issue in the first place. Under the dissent's reasoning, *any* legal question not raised by the parties would always be squarely and properly before a reviewing court. Again, no citation to authority is offered for this proposition.

¶ 67    Third, the dissent argues that, "under the approach set forth in the majority decision, our standard for deciding the legal question of whether a municipality has exceeded the home rule power granted under section 6(a) will vary, depending on what arguments are raised in the parties' briefs." According to the dissent, this will lead to a "confusing and inconsistent body of home rule jurisprudence"(*infra* ¶ 98 (Freeman, J., dissenting, joined by Burke, J.), and that the court should suspend waiver to ensure a uniform body of precedent. The dissent's concerns are unfounded. This court has stated that its opinions are authority only

for what is actually decided. *Department of Public Works & Buildings v. Farina*, 29 Ill. 2d 474, 479-80 (1963). Here, the only thing that was "decided" with respect to section 6(a) and the City's ordinance is that the Association did not raise a section 6(a) argument. It is the dissent, not the majority, that is creating the confusion by expounding at length on an issue not raised by the appellants.

¶ 68    Finally, the dissent argues that the Association did not have the benefit of this court's decision in *StubHub* when it filed its brief. The dissent points out that, in *StubHub*, this court recognized that the concept of a state statute trumping a municipal ordinance when a vital state policy is involved was not analytically appropriate when considering an argument under section 6(i) of the constitution. Although Illinois courts had considered this a section 6(i) question in the past, *StubHub* explained that this should instead be considered a section 6(a) question. While it is certainly true that *StubHub* did this, one wonders what possible relevance that is to the Association, as the Association did not argue that a vital state policy is involved here. The Association argued only that an ordinance may not be less restrictive than a conflicting state statute. Why should this court's changing the law on a point not argued by the appellants cause this court to suspend the normal rules of forfeiture? Both before and after *StubHub*, the constitution required that home rule ordinances must pertain to local government and affairs. And, as to the section 6(a) analysis, the *StubHub* majority claimed that all it was doing was applying "settled law" that this court had consistently used as the "definitive" section 6(a) analysis. *StubHub*, 2011 IL 111127, ¶ 25. The dissenting justices in this case were in the *StubHub* majority, and their position in that case necessarily precludes them from arguing here that *StubHub* so significantly altered the section 6(a) analysis that we can excuse the Association's forfeiture. The Association was certainly free to argue that this ordinance did not pertain to local government and affairs, but it chose not to. The problem with the Association's argument has nothing to do with *StubHub*. The problem is that the argument is simply wrong on its face. It was not the rule before *StubHub*, nor is it the rule now, that municipal ordinances may not conflict with state statutes.

¶ 69    Clearly, then, the dissent has offered no legitimate reason why this court should assume the role of advocate for the Condominium Association, raise an entirely new argument for it, and then reverse on that basis.

¶ 70              II. The Ordinance Pertains to the City's Government and Affairs

¶ 71    Although the question of whether the ordinance pertains to the City's government and affairs is not properly before this court, I feel compelled to point out that, even if it were, the dissent's analysis of that issue is wrong for any number of reasons. Moreover, the dissent's arguments show that, without a doubt, the dissenting justices are simply not comfortable with the system of home rule established by the Illinois Constitution.

¶ 72    First, the dissent looks at the extent of the state's regulation in the area of condominium law. This is not, however, how we decide preemption questions. No one has explained this better than Justice Freeman, who wrote in *City of Chicago v. Roman*, 184 Ill. 2d 504 (1998):

        "Further, 'comprehensive' legislation is insufficient to declare the state's exercise
        of power to be exclusive. To 'meet the requirements of section 6(h), legislation must

contain express language that the area covered by the legislation is to be exclusively controlled by the State. [Citations.] It is not enough that the State comprehensively regulates an area which otherwise would fall into home rule power.' *Village of Bolingbrook v. Citizens Utilities Co.*, 158 Ill. 2d 133, 138 (1994). After *Citizens Utilities*, 'comprehensive scheme' preemption is 'no longer the law of this state.' *Board of Trustees of the Barrington Police Pension Fund v. Village of Barrington Ethics Board*, 287 Ill. App. 3d 614, 619 (1997). 'The General Assembly cannot express an intent to exercise exclusive control over a subject through coincidental comprehensive regulation.' *American Health Care Providers, Inc. v. County of Cook*, 265 Ill. App. 3d 919, 928 (1994)." *Roman*, 184 Ill. 2d at 517.

See also *Scadron*, 153 Ill. 2d at 194 (" '[t]he fact that the state has occupied some field of governmental endeavor, or that home rule ordinances are in some way inconsistent with state statutes, is not in itself sufficient to invalidate the local ordinances' " (quoting 1972 U. Ill. L.F. at 572)); Paul Diller, *Intrastate Preemption*, 87 B.U. L. Rev. 1113, 1141, 1158-59 (2007)) (noting that Illinois is unique in that it is the only state to have no rule of implied preemption).

¶ 73    Although *Roman* was not a section 6(a) case, surely the dissent is not contending that a court can use comprehensive state regulation to render an area entirely outside of local control under section 6(a). I would ask my colleagues in the dissent to consider whether it makes *any sense at all* that this court's position should be that, while comprehensive state regulation cannot preempt home rule authority in an area, it does render the area entirely outside the authority of home rule units to act at all. Is it not obvious that this is just preemption by another name? Indeed, if comprehensive state regulation means that a particular subject does not pertain to the government and affairs of home rule units under section 6(a), then we would rarely get past step one of the analysis, and the powers of home rule units would be severely restricted. The dissent's analysis would render decisions such as *Scadron* and *Roman* meaningless.

¶ 74    Next, the dissent brushes aside the City's obviously strong and compelling interest in regulating condominiums. The dissent disagrees with the majority's point that the large number of condominiums in Chicago gives the City a vital interest in condominium record keeping. But this very same reasoning was used in *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101 (1981), in which this court upheld the right of Evanston to enact a landlord-tenant ordinance. In *Create*, this court explained:

"The city of Evanston is a densely populated and highly urbanized municipality with a large number of rental units. The City, therefore, has a strong interest in protecting both the landlord and tenant and in providing each with a detailed description of their respective rights, duties and remedies. In accordance with the goals attempted to be achieved by the creation of home rule, the local governing body can create an ordinance specifically suited for the unique needs of its residents and is keenly and uniquely aware of the needs of the community it serves. We therefore believe that the ordinance in question was one of the types contemplated in the grant of home rule powers under section 6(a) of article VII." *Create*, 85 Ill. 2d at 113-14.

As the largest condominium market in Illinois, and the third largest in the United States (http://chicagocondosonline.com/marketoverview.html (last visited Apr. 15, 2013)), Chicago's interest in having a condominium ordinance is at least as strong as Evanston's interest in having a landlord-tenant ordinance.

¶ 75     The dissent also argues that:

> "Under the City's logic, every home rule unit that has a large condominium presence can legislate in this area, with the Act reduced to providing the law for those condominiums that are in towns and villages that are not home rule units. The rights of owners in one town would differ from the rights of owners in another town. Similarly, the rights of an association would differ from city to city." *Infra* ¶ 123 (Freeman, J., dissenting, joined by Burke, J.).

Of course other home rule municipalities could enact their own condominium ordinances with different requirements. That is the whole point of home rule. In *Create*, this court did not express any concern that upholding Evanston's right to have a landlord-tenant ordinance would mean that other home rule municipalities could also enact them.[3] Again, we can simply turn to the words of Justice Freeman for an explanation:

> "[T]he possibility that different home rule units may adopt similar ordinances with differing mandatory minimum sentences should be of no concern. 'The grant of home rule powers contemplates that different communities which perceive a problem differently may adopt different measures to address the problem, provided that the legislature has taken no affirmative steps to circumscribe the measures that may be taken and that the measures taken are reasonable.' " *Roman*, 184 Ill. 2d at 514-15 (quoting *Kalodimos*, 103 Ill. 2d at 504-05).

And, if this "patchwork" of local regulations is not what the legislature intended, what should the legislature do? As Justice Freeman explained in *Roman*, " 'the state always can vindicate its interests by legislating in the proper form.' " *Roman*, 184 Ill. 2d at 519 (quoting 1972 U. Ill. L.F. at 572-73).

¶ 76     The dissent next contends that the ordinance is invalid because the entire field of real property law is off limits to home rule units. The dissent relies on the following statement from the record of proceedings of the Local Government Committee at the Sixth Illinois

---

[3]The dissent drops a footnote arguing that the City's large number of condominiums does not "make the problem so unique to Chicago that its interest its greater than the State's." The dissent does not explain where this standard comes from; the only authority cited in the footnote is a 2006 article from the Chicago Tribune about condominium conversion in northwest suburban Cook County. The constitutional requirement is that the ordinance must pertain to local government and affairs. The constitution does *not* state that home rule units may enact ordinances only when their interest in an area is so unique as to render the municipality's interest greater than the state's. As Professor Baum has explained, "home rule units are supposed to be free to carry on activities that relate to their communities *even if the state also is interested and is active* in the area." (Emphasis added.) David C. Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 155. That is the whole purpose of section 6(i).

Constitutional Convention:

> "It is clear, however, that the powers of home-rule units relate to their own problems, not to those of the state or nation. Their powers should not extent to such matters as divorce, real property law, trusts, contracts, etc., which are generally recognized as falling within the competence of state rather than local authorities. Thus the proposed grant of powers to local governments extends only to matters 'pertaining to their government and affairs.' " 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1621.

Professor Baum warned against taking this language too literally because it could mean that things such as fair housing ordinances, which involve both real property and contract law, would be off limits to home rule units. 1972 U. Ill. L.F. at 153. This court has agreed with Professor Baum and has placed a very narrow construction on the above language. In *Create*, the defendant relied on the listing of contract law in the above passage to argue that Evanston's landlord-tenant ordinance was invalid because it interfered with contracts between private citizens. This court disagreed, explaining that "the Ordinance *does not alter any basic principle* of contract law." (Emphasis added.) *Create*, 85 Ill. 2d at 114. Similarly, here, the dissent has not explained how the section of Chicago's condominium ordinance regulating the right of condominium owners to access the financial books and records of condominium associations alters any basic principles of real property law.[4]

¶ 77    Moreover, this court has consistently recognized the interest that municipalities have in regulating real property. In *Create*, we upheld the right of home rule municipalities to have landlord-tenant ordinances, and in *Schillerstrom Homes*, we explained the following:

> "Municipal development regulations, including the ordinance at issue here, undoubtedly pertain to local affairs. See *Carlson v. Briceland*, 61 Ill. App. 3d 247, 254 (zoning restrictions pertain to local affairs); *Johnny Bruce Co. v. City of Champaign*, 24 Ill. App. 3d 900, 904 (1974) (the resolution of zoning problems is left to the local exercise of plenary home rule power); accord *Treadway v. City of Rockford*, 24 Ill. 2d 488, 493-94 (1962) (pre-1970 Constitution) ('Zoning lies primarily within the province of the municipality'); *La Salle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40, 46 (1957) (pre 1970 Constitution) ('It is well established that it is primarily the province of the municipal body to determine the use and purpose to which property may be devoted'); see also *Create, Inc.*, 85 Ill. 2d at 116 (city landlord-tenant ordinance was a proper exercise of home rule power)." *Schillerstrom Homes*, 198 Ill. 2d at 290.

It is simply not possible to argue in 2013 that the entire field of real property law is off limits to home rule municipalities.

¶ 78    The dissent contends that *Create* is distinguishable because the framers recognized that

---

[4]The dissent also argues that condominium law is a blend of real property law, contract law, and corporate law, but it likewise does not identify any basic principles of corporate law or contract law that are altered by the City's ordinance. Again, all we are talking about is an ordinance that gives condominium owners greater access to the financial books and records of condominium associations.

landlord-tenant relations would fall within local control. The dissent cites a page of the record from the constitutional convention showing that the framers believed that home rule units could act to prevent slums and could enact rent control ordinances. *Infra* at ¶ 127. There are two problems with the dissent's argument. First, you cannot simultaneously argue that: (1) the entire field of real property law is off-limits to home rule units; and (2) that home rule units may act to prevent slums and may enact rent control ordinances and landlord-tenant ordinances. Either the entire field of real property law is off-limits to them or it is not; the dissent cannot have it both ways. Second, this page of the report of proceedings from the constitutional convention was *not* why *Create* upheld the right of home rule units to enact landlord-tenant ordinances. Rather, *Create* recognized this as a matter pertaining to local government and affairs because "[t]he city of Evanston is a densely populated and highly urbanized municipality with a large number of rental units." *Create*, 85 Ill. 2d at 113. And *this* reasoning applies equally to Chicago's interest in enacting a condominium ordinance. Thus, *Create* can be distinguished only if one is willing to ignore the actual basis for the court's holding.

¶ 79   Continuing to exhibit its complete discomfort with Illinois's system of home rule, the dissent complains that the majority is requiring the legislature to include "magic words" whenever it wants to preempt home rule authority. The dissent also finds it unsurprising that the legislature would not include those "magic words" here, because it never could have imagined that including those words was necessary with regard to anything having to do with real property. There are so many problems with these points that one barely knows where to begin.

¶ 80   As for the dissent's complaint of a "magic words" requirement, that requirement has three sources. First, the constitution clearly imposes that requirement. See Ill. Const. 1970, art. VII, § 6(h), (i). Second, this court has interpreted the constitution as imposing that requirement. I again point the reader to Justice Freeman's opinion in *Roman*, where he discusses the magic words requirement in detail, explains that this is the only way that the legislature can preempt home rule authority, and notes that the legislature has included the magic words in many different statutes. *Roman*, 184 Ill. 2d at 515-18. Third, the legislature has imposed this requirement on itself. As the majority notes, but the dissent ignores, section 7 of the Statute on Statutes specifically provides that no legislative act after January 12, 1977, may be read as preempting home rule authority unless it contains specific preemption language. 5 ILCS 70/7 (West 2010). There is no hint given by the dissenting justices why they believe this court is free to ignore constitutional text, controlling authority from this court, and an express statutory directive from the legislature.

¶ 81   As for the dissent's claim that the legislature could not possibly have imagined the need to include the magic words in the section of the Condominium Property Act at issue, the dissent must know that this is not true. As the City explains in its brief, the legislature requested a home rule note from the Illinois Department of Commerce and Economic Opportunity before the second reading of Senate Bill 408 in the House, and the legislature was advised by the Department that the amended bill did "not preempt home rule authority." So, even after being advised by the Department that the legislation did not preempt home rule authority, the legislature *still* chose not to include preemption language in the bill. And, we

-19-

must not ignore the facts that: (1) the same session of the General Assembly included express preemption language in other bills (see, *e.g.*, 215 ILCS 155/3.1 (added by Pub. Act 90-317, § 5, eff. Aug. 1, 1997); 225 ILCS 51/170 (added by Pub. Act 90-532, § 170, eff. Nov. 14, 1997)); and (2) the legislation in question was enacted over 15 years after this court had already upheld the right of home rule units to enact landlord-tenant ordinances. In other words, the legislature knew *exactly* what it was doing, and the dissent's claim that this court should now usurp the legislature's preemption authority is simply untenable.

¶ 82                                    III. Conclusion

¶ 83    In sum, the dissent filed by Justices Freeman and Burke is fundamentally flawed for two independent reasons: (1) they improperly assume the role of appellate advocate for the Condominium Association, raising an unargued and unbriefed issue on its behalf and then criticizing the court for not reversing on this unargued and unbriefed basis; (2) the view of home rule expressed therein is diametrically opposed to our state's constitution, case law, and statutes, and seems to advocate a return to the very system that the framers of the 1970 Constitution intended to replace. As for the parade of terrible consequences of this decision that the dissent envisions, there is a simple answer. If the legislature wants this to be an area of exclusive state control, then the legislature can make it such with a single sentence. As this court stated in *Village of Bolingbrook v. Citizens Utilities Co. of Illinois*, 158 Ill. 2d 133, 142-43 (1994), "It is not for us to usurp a function accorded to the General Assembly by the Constitution."

¶ 84    JUSTICE FREEMAN, dissenting:

¶ 85    Today's decision marks an unnecessary departure from settled law in two important areas—home rule jurisprudence and condominium property law. Ultimately, the court subjects real property owners who happen to live in condominiums to home rule ordinances that deny them important protections intended by the General Assembly to operate statewide. While the decision affects only production of condominium records, there is nothing in the court's approach to home rule that would limit further local intrusions on real property condominium ownership. I therefore respectfully dissent.

¶ 86                                    BACKGROUND

¶ 87    On September 15, 1999, plaintiff, a condominium owner at 2800 Lake Shore Drive Condominium Association,[5] sent a letter to the Association's board of directors requesting production of what the majority characterizes as "specific documents and records related to the building's management." *Supra* ¶ 4. Plaintiff sought (1) all contracts in effect since 1977 between the Association and some 18 different entities; (2) minutes from all board meetings

_____

[5]The Association recorded its condominium instruments, including its declaration, on June 8, 1979. See 765 ILCS 605/6 (West 2000) (upon recording, the property "shall become subject to the provisions of [the Condominium Property] Act").

from 1980 through 1990; (3) all building expenditures for fiscal year 1988 to the present; (4) ballots from the 1998 election of the board of directors; and (5) bank statements for 1998, plus itemized financial records from 1988.

¶ 88　　　　On September 28, 1999, the Association's attorney sent plaintiff a letter which acknowledged that some of the records and documents sought had been previously turned over to plaintiff and noted that plaintiff's request sought documents which dated back over 20 years to a time before the condominium association was even created. The letter also stated that plaintiff's current request, as well as his previous requests, required management to divert time from serving the Association to fulfilling document demands that seemed designed only to vex and harass.

¶ 89　　　　The board did not turn over the documents, and plaintiff commenced this lawsuit in January 2000. Plaintiff's initial complaint was dismissed without prejudice. Plaintiff thereafter filed a four-count amended complaint, which alleged that defendants committed a variety of violations of both the Association's declaration and of the Condominium Property Act (Condominium Act or Act) (765 ILCS 605/1 *et seq.* (West 2000)). Although the Condominium Act was referenced throughout the complaint, with respect to count IV, which is the only count at issue in this appeal, plaintiff challenged the failure to produce all of the documents requested in his September 15 letter, and cited to a Chicago municipal ordinance requiring that "financial books and records" be turned over upon request within three days. The amended complaint was subsequently dismissed in its entirety. In dismissing count IV without prejudice, the court found that the document-access requests were nothing more than a "fishing expedition" because plaintiff did not allege a proper purpose for those requests.

¶ 90　　　　Plaintiff filed a motion to reconsider the dismissal, which was denied. He then filed a second motion to reconsider. In the interim, due to the resignation of the original judge who heard the matter, a new judge was assigned to the case and ruled on the second motion to reconsider. The court declined to reconsider the previous dismissal of the first three counts of the amended complaint. The court, however, vacated the dismissal of count IV, and plaintiff thereafter filed a motion for summary judgment with respect to that count, which was the only count that remained pending. The circuit court granted the motion in part and denied it in part, with the court specifically ruling that the Chicago ordinance mandated the production of the following documents:

　　　　• Itemized and detailed records of all building expenditures during 1988, 1989, 1994, and 1999 to the present.

　　　　• Itemized and detailed financial records for the period of 1988 to the present of the Association's reserve fund.

　　　　• Bank statements for 1998 from three different banks.

　　　　• Minutes of the board for the period of 1980 through 1990.

　　　　• All documents relating to exterior concrete facade; any and all documents between the Association and the CPA firm of Altschuler, Melvoin, and Glasser; any and all documents between the Association and Reserve Advisors; any and all documents relating to defects in pipes, including those documents from the original

-21-

engineering firm for the building; any and all documents relating to the condition of the exterior concrete facade between the Association and the original architectural firm for the condominium building.

The circuit court also included Rule 304(a) language in its order, which allowed the issue to be immediately appealed. The court further awarded plaintiff interim attorney fees pursuant to the Chicago ordinance.[6]

¶ 91    The appellate court affirmed, holding that the Chicago ordinance mandated the production of the documents. 401 Ill. App. 3d 868.

¶ 92                              ANALYSIS

¶ 93                            I. Home Rule

¶ 94    As the majority acknowledges, this court traditionally has employed a three-part test in reviewing the constitutionality of an exercise of home rule power. *Supra* ¶ 35 (citing *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 289-90 (2001)). The first element of that inquiry requires that we determine whether the challenged exercise of local government power pertains to local government and affairs, as mandated by section 6(a). *Id.* If so, we then must consider whether the General Assembly has preempted the use of home rule powers in the relevant area. *Id.* If the legislature has not preempted the area, we then determine "the proper relationship" between the local ordinance and the state statute. *Id.* In examining "the proper relationship" between an ordinance and a statute, this court has held that " '[w]hether a particular problem is of statewide rather than local dimension must be decided *** with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it.' " *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶ 24 (quoting *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 501 (1984)); see also *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 176 (1992).

¶ 95    Here, the majority entirely omits the first element of our traditional analysis because defendants have not specifically challenged whether the City's ordinance pertains to its local government and affairs. The omission of that analysis is improper for several reasons.

¶ 96    First, the City's brief *does* contain an argument regarding whether its ordinance constitutes a valid exercise of home rule power under section 6(a). Thus, although it was not raised by defendants, that issue is squarely and properly before the court. Moreover, this court has recognized that a reviewing court may, in furtherance of its responsibility to provide a just result and to maintain a sound and uniform body of precedent, override considerations of waiver that stem from the adversarial nature of our system. *Hux v. Raben*, 38 Ill. 2d 223, 224-25 (1967); see also *People v. Givens*, 237 Ill. 2d 311, 325 (2010); Ill. S.

---

[6]While the interlocutory appeal from the grant of summary judgment on count IV was proceeding in the appellate court as well as this court, the parties continued their litigation in the trial court. Plaintiff ultimately filed a third-amended complaint in the case, which apparently went to trial. Those allegations are not at issue in this appeal.

Ct. R. 366(a)(5) (eff. Feb. 1, 1994). I believe that responsibility outweighs defendants' procedural default in this case. See, *e.g.*, *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 504-05 (2002) (and cases cited therein). In my view, it is inappropriate to sidestep a significant, and I believe dispositive, element of our traditional analysis simply because it was not argued by some of the parties to the litigation.

¶ 97 Second, the question of whether a matter falls within the scope of the home rule power granted in section 6(a) is a legal one. See *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537, 540 (1975) (holding that the "qualifying phrase 'pertaining to its government and affairs' *** will ultimately depend upon an interpretation by this court as to whether or not the power exercised is within the grant of section 6(a)"); see also *StubHub*, 2011 IL 111127, ¶ 19 (noting that the determination of this question lies in judicial interpretation of this qualifying phrase). As such, this court is not bound to abide by the parties' contentions. See *Hux*, 38 Ill. 2d at 225.

¶ 98 Third, under the approach set forth in the majority decision, our standard for deciding the legal question of whether a municipality has exceeded the home rule power granted under section 6(a) will vary, depending on what arguments are raised in the parties' briefs. This variable approach will lead to a confusing and inconsistent body of home rule jurisprudence that fails to provide necessary guidance to municipalities throughout the state.

¶ 99 Finally, ignoring the first element of the traditional three-part test is manifestly unfair under the circumstances presented here. As the majority has recognized, defendants do not dispute that the City's ordinance pertained to its local government and affairs. Instead, defendants focus their arguments on the third element of the test, addressing "the proper relationship" between the ordinance and the relevant state statutes. That argument necessarily requires consideration of " 'the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it.' " *Stubhub, Inc.*, 2011 IL 111127, ¶ 24 (quoting *Kalodimos*, 103 Ill. 2d at 501 (1984)); see also *Scadron*, 153 Ill. 2d at 176. Defendants claim that the City's ordinance is invalid because it effectively nullifies several important provisions of the Condominium Act and the General Not For Profit Corporation Act of 1986, which govern the duty of condominium associations in Chicago to maintain and disclose certain books and records. In refusing to address defendants' claims, the court relies on a footnote in *StubHub*, which "recognized that 'the concept of a vital state policy trumping municipal power is analytically appropriate under section 6(a)' rather than section 6(i)." *Supra* ¶ 36 (quoting *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶ 22 n.2).

¶ 100 However, the court's approach is fundamentally flawed because defendants did not have the benefit of our decision in *StubHub*, which was argued during the same term as this case and was not finally decided until November 2012, 18 months after both cases were submitted. Consequently, when the instant case was briefed and argued, the traditional three-part test that had governed our analysis of home rule power for more than 30 years included consideration of whether a vital state policy should take precedence over home rule authority, even if the problem pertained to local government and affairs. See *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 291 (2001). Under that test, a party could challenge the constitutional validity of an exercise of home rule power without contesting that the problem

addressed by the municipality pertained to its government and affairs. It was only in *StubHub*, that this court explicitly held, albeit in a footnote, that the existence of a vital state policy was not "analytically appropriate" in cases involving concurrent authority under section 6(i). At the time defendants formulated and presented their arguments, they did not know that we were about to dispense with the third element of our long-standing inquiry in such cases. We can only assume that, had defendants known that our decision in *StubHub*, would render the third element of the traditional test a nullity in cases analyzed under section 6(i), they would not have limited their argument to that element alone.

¶ 101 More importantly, *any* analysis regarding the validity of home rule power must begin with a determination of the legal question of whether the problem pertains to local government and affairs, as required by section 6(a). After our decision in *StubHub*, section 6(i) cases are governed by the following standard: "If a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, municipalities may exercise their power." *StubHub*, 2011 IL 111127, ¶ 22 n.2. Accordingly, the first step in our analysis under section 6(i) requires consideration of the "pertaining to [local] government and affairs" language under section 6(a), which is the first element of our traditional test. Therefore, though it was not argued by defendants, this court should undertake that analysis with regard to the ordinance at issue in this case or, at the very least, order supplemental briefing on the question, in light of our intervening decision in *StubHub*. Alternatively, the court should consider defendants' arguments as to the "proper relationship" between the City's ordinance and the relevant state statutes, in accordance with the traditional three-part inquiry that has guided our home rule jurisprudence for more than three decades. As set forth below, I believe that analysis compels a finding that the City's ordinance exceeds the home rule power granted in section 6(a).

¶ 102 Defendants first contend that the Chicago ordinance, if valid, eviscerates section 19 of the Condominium Act, which sets forth both the rights and obligations of the Association and individual unit owners with respect to record keeping and access. They contend that the City does not have the authority under the Illinois Constitution to act in this manner.

¶ 103 Before addressing defendants' constitutional arguments, it is necessary to compare the two competing provisions. The state statute is found in section 19 of the Condominium Property Act (765 ILCS 605/19 (West 2000)). The Act, as I will explain in detail later, is an enabling statute which not only recognizes the condominium as a form of property ownership in Illinois, but also sets forth the manner in which condominium associations must be managed as well as the rights and duties of the association and individual owners to each other. Section 19 imposes on a condominium association's board of directors the duty to keep and maintain (1) the association's declaration, bylaws, rules and regulations; (2) minutes of all meetings of the association and its board for seven years; and (3) all current policies of insurance of the Association. 765 ILCS 605/19(a) (West 2000). Section 19 also requires the board to produce, within 30 days, these documents to any owner who makes a written request stating with particularity the documents sought to be examined. 765 ILCS 605/19(b) (West 2000). Nothing in the Act otherwise obligates an association to keep and maintain minutes that are older than seven years.

¶ 104 Further, section 19 requires the board to keep "all contracts, leases, and other agreements

then in effect to which the association is a party." 765 ILCS 605/19(a)(6) (West 2000). In other words, the board is not required to keep expired contracts and is under no obligation to produce such a document even upon request. Section 19 requires the board to keep and maintain the "books and records of account" for an association's current and 10 preceding fiscal years, including itemized and detailed records of all receipts and expenditures. 765 ILCS 605/19(a)(9) (West 2000). An association member has a right to request these types of materials only if the request is made in writing and states a proper purpose. 765 ILCS 605/19(b) (West 2000). Section 19 imposes on the requesting association member the burden of proving, in an action to compel, that the request is based on a proper purpose. 765 ILCS 605/19(e) (West 2000). Moreover, no attorney fees can be assessed against the board unless a court first specifically finds that the board acted in "bad faith" in denying the member's request. 765 ILCS 605/19(e) (West 2000). Finally, section 19 specifically exempts certain documents from disclosure, "unless otherwise directed by court order." These include documents relating to association employees' discipline or dismissal; documents relating to actions pending against or on behalf of the association or its board in a court or administrative tribunal; and documents relating to the common expenses or other charges owed by an association member other than the requesting member. 765 ILCS 605/19(g) (West 2000).

¶ 105    In contrast to section 19's specific and comprehensive provisions, the City of Chicago ordinance states generally as follows:

> "No person shall fail to allow unit owners to inspect the financial books and records of the condominium association within three business days of the time written request for examination of the records is received." Chicago Municipal Code § 13-72-080 (2009).

The ordinance contains no time limits for the keeping of financial books and records. In contrast, the Act imposes a statutory duty on boards to keep such records for 10 years. In addition, the requirement of a proper purpose for a record request is not included in the ordinance. The ordinance therefore imposes a less stringent burden on association members in Chicago in requesting such records than does section 19. Also, section 19 gives the association 30 days to produce; the ordinance allows only 3 days. Therefore, the ordinance and section 19 are in direct conflict.

¶ 106                          *Home Rule: General Principles*

¶ 107    The Illinois Constitution of 1970 gave home rule municipalities broad power to deal with problems that were local in nature. *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 286 (2001). The notion of home rule, in fact, was predicated on the assumption that problems affecting municipalities and their residents should be met with solutions tailored to local needs and concerns. *Id.* As a result, our constitution provides that home rule units "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

¶ 108    As this court recently iterated in *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶¶ 18, 19, while this "intentionally imprecise language" grants local governmental units "the broadest powers possible," that home rule authority nevertheless must relate only to local problems. This court, while mindful of the constitutional mandate of liberal construction, has not hesitated to strike down home rule ordinances where they did not pertain to the government or affairs of the local unit (see *Ampersand, Inc.*, 61 Ill. 2d at 542 (collecting cases)), and *StubHub* stands as the most recent example of this principle. As noted above, the meaning of the "qualifying phrase 'pertaining to its government and affairs' *** will ultimately depend upon an interpretation by this court as to whether or not the power exercised is within the grant of section 6(a)." *Ampersand, Inc.*, 61 Ill. 2d at 540; *StubHub*, 2011 IL 111127, ¶ 19.[7] Thus:

> "If a home rule unit attempts to exercise a power or to perform a function which is not within the scope of the grant contained in [ ]section 6(a)—*i.e.*, if the action does not pertain to the government and affairs of the home rule unit—*** the exercise or performance would be void unless authorized by statute or by another provision of the 1970 Constitution." ILCS Ann., 1970 Const., art. VII, § 6, Constitutional Commentary, at 265 (Smith-Hurd 2006).

¶ 109              *The Chicago Ordinance Does Not Pertain to the City's*
                                *Government and Affairs*

¶ 110    This court has recognized that an ordinance pertains to local government and affairs where it addresses local, rather than state or national, problems. *Schillerstrom*, 198 Ill. 2d at 290. That determination requires the court to consider the " 'nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it.' " *StubHub*, 2011 IL 111127, ¶ 24 (quoting *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 501 (1984)).

¶ 111    The majority decision states that "[t]he primary issue in this appeal is whether a City of Chicago ordinance allowing condominium unit owners to inspect condominium association financial books and records is a valid exercise of the City's home rule power." *Supra* ¶ 1. Yet, characterizing the issue in this manner overlooks critical aspects of condominium property ownership. Indeed, to describe the problem as relating only to unit owners' access to association documents is to look at the issue only from the perspective of the individual unit owner. That is too narrow and does not comport with condominium law, which was created to address ownership rights from the perspective of both the individual unit owner

---

[7]Significantly, the drafters' intent regarding this inquiry contrasts sharply with their intent with respect to the separate question of whether the General Assembly has preempted home rule in a given area. As to that question, our case law is clear that once a home rule unit falls within the grant of power of section 6(a), the drafters intended to "eliminate or at least reduce to a bare minimum the circumstances under which local home rule powers are preempted by judicial interpretation." *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 186 (1992).

*and* the perspective of the joint holders of the common property of the association.[8] What may be in the best interest of an individual unit owner may not be in the best interest of the association. Therefore, condominium laws have been historically designed to *balance* the needs of both. As section 19 demonstrates, the unit owners' right of access to certain records must be balanced against the association's duty to keep and maintain those records in the first instance. This balancing of competing interests reflects the need to protect associations and unit owners alike from potential abuses. These issues, which are addressed in section 19, are not covered in the ordinance. As we just made clear in *StubHub*, this court "can declare a subject off-limits to local government control only where the state has a vital interest and a traditionally exclusive role." *StubHub*, 2011 IL 111127, ¶ 25. As I explain below, the General Assembly appears to have seen the matter from defendants' perspective, as shown by the extent and history of the state's activity as well as by the legislative record.

¶ 112        A condominium is a form of joint ownership of real property which has been defined as "a system of separate ownership of individual units in multi-unit projects." 1 Patrick J. Rohan & Melvin A. Reskin, Real Estate Transactions: Condominium Law & Practice § 1.01(1) (1974). Each unit owner holds title to his or her unit in fee simple, and owns the underlying common elements as a tenant in common with other unit owners. *Id.* Ownership of the units in fee simple permits financing tailored to individual needs and minimizes the economic dependence of neighbors. *Id.* § 9.01. As a result, for a condominium arrangement to be feasible, the rights and duties of unit owners with respect to the common elements must be clearly defined. Generally, an association consisting of unit owners is organized to tend to administrative matters, maintenance, and allocation of common expenses. *Id.* § 5.04.

¶ 113        The condominium form of ownership of real property was recognized in the United States as early as 1947 in New York.[9] Allan Goldberg, *The Illinois Act and Condominium Titles*, in Illinois Condominium Law § 1.3 (Ill. Inst. for Cont. Legal Educ. 2010). In 1951, the legislature of Puerto Rico became the first to enact specific legislation acknowledging the right to own real property in this manner. *Id.* § 1.4. In 1960, the United States Congress recognized condominiums as a form of property ownership that was to be included within the purview of federally guaranteed housing legislation. *Id.* As a result, Congress amended the National Housing Act to require each state to recognize the condominium as a form of real property ownership before a Federal Housing Authority mortgage guarantee could issue. *Id.* § 1.5; see also Charles E. Ramsey, Condominiums: The New Look in Co-ops, Practical

---

[8]Individual unit owners enjoy collective ownership in common areas of the property with other unit owners as tenants in common. 1 Gary A. Poliakoff, The Law of Condominium Operations § 1.1 (1988).

[9]Commentators disagree somewhat as to whether this form of property ownership existed historically at common-law. See Carol Jane Brown, Note, *Special Declarant Rights and Obligations Following Mortgage Foreclosure on Condominium Developments*, 25 Wm. & Mary L. Rev. 463, 465 (1984) (collecting sources). There is authority for common interest property ownership in England and Scotland without benefit of statute. Curtis J. Berger, *Condominium: Shelter on a Statutory Foundation*, 63 Colum. L. Rev. 987, 1001-02 (1963).

and Legal Problems 22 (1961) (noting that section 234 of National Housing Act included a condition requiring "that the concept of condominium homeownership must be established under the laws of the state where the property is located"). At the time of Congress' action, it was generally recognized that state legislation must do three things: (1) "provide a procedure for the establishment and dissolution of a condominium," (2) "accommodate existing legislation dealing with taxation, recording procedures, liens, land-use control, and security regulatory techniques to the special needs of condominiums, and (3) anticipate possible judicial antagonism involving matters such as bars on partition and covenants real." Curtis J. Berger, *Condominium: Shelter on a Statutory Foundation*, 63 Colum. L. Rev. 987, 1003 (1963) (Berger).

¶ 114 The original Puerto Rican statute served as the model of condominium legislation, and the National Conference of Commissioners on Uniform State Laws subsequently promulgated a model act designed to bring uniformity to the statutes governing this unique form of property. Jonathan D. Ross-Harrington, *Property Forms in Tension: Preference Inefficiency, Rent-Seeking, and the Problem of Notice in the Modern Condominium*, 28 Yale L. & Pol'y Rev. 187, 198 (2009). While it was generally accepted that a condominium could exist under common law principles, most legal commentators at the time argued that this particular form of property ownership would not grow in the way Congress intended without statutory provision. Berger, *supra*, at 1002. Enabling statutes, it was argued, provided the necessary assurances that the legal system would fully recognize unit ownership as an interest in real property that would, in turn, stimulate the interest and elicit the confidence of lenders, consumers, and suppliers of labor and services. *Id.* at 1003. In other words, state legislation would not only provide certainty in real property law, but would also provide increased marketability and insurability

¶ 115 By 1968, every state had enacted a condominium statute. Carol Jane Brown, *Special Declarant Rights and Obligations Following Mortgage Foreclosure on Condominium Developments*, 25 Wm. & Mary L. Rev. 463, 466 (1984). All state statutes have several things in common. First, they "provide for recognition of divided ownership and the utilization of conveying instruments that adequately and clearly demonstrate ownership and transferabilty." David Clurman, F. Scott Jackson & Edna Hebard, Condominiums and Cooperatives 13 (2d ed. 1984). Further, they "regulate procedures, delineate the duties of the individual unit owners, as well as of the condominium association, provide for the distribution of responsibilities in the event of damage, destruction or condemnation, and determine the legal rights of condominium unit owners and associations in the event of defaulting individual unit owners." 4 David A. Thomas, Thompson on Real Property 237-38 (2d ed. 2004). As a result, it is said that condominium law is a "blend" of both property and contract law, along with aspects of corporate law. Ross-Harrington, *supra*, at 198-99.

¶ 116 It was in response to this nationwide effort to facilitate condominium real estate law that our General Assembly enacted the Condominium Property Act in 1963, which addresses both condominium creation and management. The Act governs the rights of the owners to the use and enjoyment of their property and also provides for the areas in which common expenses are to be allocated. The Act further regulates procedures and delineates the duties of individual unit owners as well as those of the association, as section 19 demonstrates.

Almost immediately, the concern of legal scholars that state condominium law had to "accommodate existing legislation dealing with taxation, recording procedures, liens, land-use control, and security regulatory techniques to the special needs of the condominiums" (Berger, *supra*, at 1003) was illuminated. Provisions had to be added to address the method by which real estate taxes could be imposed on condominium property and the manner by which tax relief could be sought. See, *e.g.*, Ill. Ann. Stat., ch. 30, ¶ 310, Historical & Practice Notes, at 203-04 (Smith-Hurd Supp. 1992). Other changes included, *inter alia*, (1) recognizing condominium associations as non-for-profit corporations. (Ill. Ann. Stat., ch. 30, ¶ 250, Historical & Practice Notes—Introduction, at 146 (Smith-Hurd Supp. 1992)); (2) coordinating language to synchronize condominium law with the Illinois Mortgage Foreclosure Law (Ill. Ann Stat., ch. 30, ¶ 309, Historical & Practice Notes, at 185 (Smith-Hurd Supp. 1992)); (3) authorizing condominiums to enter into master metering agreements with respect to telephone, gas, and electric public utility services (Ill. Ann. Stat., ch. 30, ¶ 250, Historical & Practice Notes—Introduction, at 149 (Smith-Hurd Supp. 1992)); (4) providing for the procurement of insurance and insurance trust funds (this was done so that condominium associations could benefit from the General Assembly's comprehensive insurance reform package and the Charitable Trust Pool Act) (Ill. Ann. Stat., ch. 30, ¶ 312.1, Historical & Practice Notes, at 213 (Smith-Hurd Supp. 1992)); and (5) requiring officers and directors to have a fiduciary bond and fidelity insurance coverage in certain amounts so as to lessen the difficulty in obtaining such insurance. I cite these provisions only to show examples of the variety of ways Illinois condominium law touches upon other areas of general law.

¶ 117 With respect to the powers and duties of a condominium board of directors (including the duty of record keeping), it is clear that from its beginnings the Act was designed to put condominium associations on as equal a footing as possible with other corporate associations doing business in the state. See Ill. Ann. Stat., ch. 30, ¶ 250, Historical & Practice Notes—Introduction, at 146 (Smith-Hurd Supp. 1992). The Act permits for condominium associations to file papers of incorporation with the Secretary of State and further grants all associations all of the powers specified in the General Not For Profit Corporation Act, even if the association is not incorporated. See *St. Francis Courts Condominium Ass'n v. Investors Real Estate*, 104 Ill. App. 3d 663, 667 (1982). The record-keeping provisions of the Act originally corresponded to those in the General Not For Profit Corporation Act. Public Act 85-1386 was the first in which the legislature moved away from the strictures of the Not For Profit Act to ensure that freedom of information provisions were made applicable to condominium units. 85th Ill. Gen. Assem., Senate Proceedings, July 1, 1988, at 52 (statements of Senator Karpiel). This was done for a number of reasons, including having uniform sources of information for owners seeking federal mortgages. According to the House sponsor, Representative Levin, Senate Bill 1719, which addressed comprehensive changes to the Condominium Act, included provisions that "strengthen[ed] the books and records provisions of the Condo Act for unit owners." 85th Ill. Gen. Assem., House Proceedings, July 1, 1988, at 88 (statements of Representative Levin). The comprehensive legislation was the product of an agreement with the Chicago Bar Association, mortgage lenders, and the State's Attorney's office of Cook County. *Id.*

¶ 118    By 1991, the General Assembly again addressed comprehensive condominium issues that related to record keeping, proxy voting, and reserve funding, this time in Public Act 87-746. The legislative debates reveal that the Illinois State Bar Association objected to some of the proposed record-keeping provisions because it "is more *** micro-management of boards of directors." 87th Ill. Gen. Assem., Senate Proceedings, July 2, 1991, at 47 (statements of Senator Geo-Karis). Eventually, the bill received bipartisan support, and approval from both the Illinois State and Chicago Bar Associations. 87th Ill. Gen. Assem., Senate Proceedings, July 3, 1991, at 11 (statements of Senator Cullerton).

¶ 119    Shortly thereafter, the legislature had to revisit the issue again in Public Act 88-135. The problem sought to be avoided was the impact that the new laws had on secret ballot voting in association elections. 88th Ill. Gen Assem., House Proceedings, May 12, 1993, at 125 (statements of Representative Ervin). Finally, in 1998, the General Assembly again addressed the record-keeping duties of an association's directors, this time in response to problems with burdensome requests for older documents. During the debate of Public Act 90-0496, the bill's House sponsor, Representative Feigenholtz of Chicago, was asked what exactly the problem was that was being solved by the bill. She responded:

> "Actually, some people have been going to their condominium associations and asking for records that are very, very old. And it's actually been very burdensome. So, what we're trying to do here is set up a better, more expedited system." 90th Ill. Gen. Assem., House Proceedings, May 13, 1997, at 20 (statements of Representative Feigenholtz).

In fact, Representative Feigenholtz characterized the legislation as a "most compelling condominium matter." *Id.* at 23. During the Senate debate, the bill's sponsor, Senator Cullerton of Chicago, noted that the bill dealt with "the examination of condominium records" and "allows for obtaining records of condominium board of managers, certain guidelines and rules that you have to follow to gain access to those records." 90th Ill. Gen. Assem., Senate Proceedings, May 31, 1997, at 16-17 (statements of Senator Cullerton).

¶ 120    Thus, the floor debates reveal that unfettered record access had become yet another problem relating to condominium record keeping because it allowed for burdensome requests that were difficult to meet. The General Assembly sought to solve this problem by amending the Act to delineate between the various different types of records that can be requested. As a result, section 19 now establishes *nine* different classes of records that a board must maintain and keep. 765 ILCS 605/19(a) (West 2000). The General Assembly further imposed time limits for the keeping of such documents (7 years for meeting minutes, 10 years for financial records). *Id.* Importantly, in balancing the interests of an individual owner and the rest of the Association's members with respect to "record access," the General Assembly chose to obligate the unit owner who is requesting financial records to articulate a "proper purpose." 765 ILCS 605/19(e) (West 2000); see also *Taghert v. Wesley*, 343 Ill. App. 3d 1140, 1146 (2003) (noting that the Act vests condominium association members with inspection rights established in the statutory law of corporations). The requesting unit owner likewise has the burden of proof in any court action to compel requests. 765 ILCS 605/19(e) (West 2000). The statute does not allow for the recovery of attorney fees without a court's specific finding of "bad faith." *Id.* Finally, the statute explicitly states that it pertains to all

condominiums incorporated in this state and is an expression of public policy. 765 ILCS 605/19(h) (West 2000).

¶ 121    It is therefore clear from the outset of condominium regulation in Illinois that condominium record keeping cannot be considered in a vacuum, as the majority's view indicates. It is part and parcel of a larger statutory scheme and has purposes beyond protection of a unit owner's right of access. Rather, record access is needed for a multitude of reasons, including financing and insurance. To address this, the General Assembly borrowed from areas of corporate law. Thus, the General Assembly chose to view the matter of condominium creation, management, and regulation as a problem which was twofold in nature: creating a new form of real property interest and ensuring that the new law matched up with other areas of substantive law in order to properly delineate both owners' and associations' rights and obligations. To do this, the General Assembly created a comprehensive statute which borrowed heavily from areas of contract and property law, as well as corporate law.

¶ 122    Our recent *StubHub* decision underscores that the "problem" in this case is not local. There, we reviewed the historical and legislative record with respect to the Ticket Sale and Resale Act to conclude that the City of Chicago did not have the authority under section 6(a) to require electronic intermediaries to collect and remit amusement taxes on resold tickets. *StubHub*, 2011 IL 111127, ¶¶ 26-36. Similarly, here the history and legislative record of this enabling statute indicates that its subject matter is not local and, therefore, falls outside of section 6(a).

¶ 123    In addition, examination of the third element of our traditional three-part inquiry reflects that the state has a vital interest in the regulation of condominium ownership such that the statute must take precedence over the City's ordinance. The City asserts that the abundance of condominiums in Chicago renders its interest in solving the "problem" of record keeping and access greater than the state's. This assertion misses the point.[10] Under the City's logic, every home rule unit that has a large condominium presence can legislate in this area, with the Act reduced to providing the law for those condominiums that are in towns and villages that are not home rule units. The rights of owners in one town would differ from the rights of owners in another town. Similarly, the rights of an association would differ from city to city. It is for this reason that the state has the greater obligation to Illinois property owners so as to ensure the proper balance between individual unit owners' rights and those of the collective association. The Act, as I have noted, works to ensure that condominium regulations are uniform so as to facilitate Congress' desire to enhance this form of property

---

[10]To the extent that the City is arguing that because it has many condominiums within its city limits, that does not make the problem so unique to Chicago that its interest is greater than the state's. Chicago suburbs have experienced greater condominium development as land becomes scarce. For example, in 2005, 2,139 units were converted to condominiums in northwest suburban Cook County alone. Annemarie Mannion, *Conversion Country: Suburban Complexes Offer Condo Buyers Space, Location and Affordabilty; Investors Like Them, Too*, Chi. Trib., Apr. 22, 2007, § 16, at 1.

ownership.[11] In order to preserve this national uniformity and to safeguard the rights of associations and unit owners alike, the legislature has acted in areas beyond record keeping and has allowed for fiduciary bonds, increased protections against individual owners' failure to pay assessments and mortgage foreclosures, and mandatory insurance—not just on property but also for directors and officers, again borrowing from principles of corporate law.

¶ 124    The City's ordinance directly impedes the purposes of the Condominium Act, which include protecting unit owners' right of access to association records, while imposing reasonable limitations on the record-keeping and disclosure obligations of the association. Defendants note that in order to comply with the City's ordinance, they would have to keep books and records, including minutes, for an indefinite period of time and would have to turnover documents to any owner who so requests even though the owner does not state a proper purpose. They would, in fact, have to break state law (and violate a statutorily imposed duty) in order to comply with the City's ordinance. Obviously, if other municipalities followed the City's lead and deviated from state law in such a way, there would be a "patchwork" of local regulations. This, of course, frustrates the very reason for the uniform state laws that were envisioned when the condominium form of ownership was first recognized. Almost all legal commentators recognized that a comprehensive and consistent approach to condominium regulation should be instilled among the states. It is clear from the history of our Act the General Assembly shared this view and chose to impose uniform rules for the creation and management of condominiums across our state. I am therefore compelled to conclude that the state has a greater interest than any municipality in regulating this relatively new form of property ownership.

¶ 125    Again, *StubHub* underscores this conclusion. There, we specifically acknowledged that the phrase "pertaining to [local] government and affairs" in section 6(a) does *not* relate to matters such as divorce, real property, trusts, and contracts. *StubHub*, 2011 IL 111127, ¶ 19 (citing 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1621). We also held that the General Assembly's choice of imposing "a more comprehensive and uniform approach," as opposed to a "patchwork" of local regulations, was evidence that the state had a greater interest in solving the problem of tax collection on resold tickets. See *StubHub*, 2011 IL 111127, ¶ 34.[12] In this case, the conclusion that the state has the greater interest in regulating condominium ownership, an aspect of property law, is even clearer. This conclusion is not undermined by the fact that we have recognized the authority of home rule units to regulate landlord-tenant relationships. See *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 113-14 (1981). The landlord-tenant relationship is not the equivalent of an

---

[11]The reason Congress encouraged condominium growth was because it was deemed to be in the national interest to provide more affordable housing for people. Carol Jane Brown, Note, *Special Declarant Rights and Obligations Following Mortgage Foreclosure on Condominium Developments*, 25 Wm. & Mary L. Rev. 463, 466-67 (1984). In short, it allowed many Americans to pursue the dream of owning one's own home.

[12]We held this despite the fact that section 6(a) contains language that expressly grants to home rule units the power "to tax." Ill. Const. 1970, art. VII, § 6(a).

individual's ownership rights in real property. Also, the constitutional debates make clear that it was the intent of the drafters, that like the power to tax, landlord-tenant relations were intended to fall within the purview of section 6(a). See 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1605 (noting that the prevention of "slums" was one of the reasons for the broadened local powers), 1652 (allowing for rent control ordinances under home rule). Neither the provisions of the home rule article nor the constitutional debates indicate an intent to include the regulation of condominium ownership among the matters embraced by home rule power.

¶ 126    Finally, in terms of whether the state or the municipality has a traditional role in solving the problem, the history of condominium law reveals that the state has, by virtue of congressional mandate, had the traditional role in condominium creation, management, and regulation. The power to form a condominium association flowed from the state, not the local municipality. This conclusion is not only supported by the history of condominium law that I set forth above, but is also supported by the constitutional debates on home rule.

¶ 127    As noted earlier, this court has repeatedly stressed that whether a matter of local or statewide concern is a question of law, left by the constitution to judicial interpretation. Fortunately, Illinois judges have extensive commentary from the constitutional debates to guide us in this area. For example, the Report from the Local Government Committee, which drafted article VII, states that section 6(a)'s phrase "any function pertaining to its government and affairs" was derived from Model Constitutional Provisions for Municipal Home Rule prepared by Dean Jefferson Fordham of the University of Pennsylvania Law School for the American Municipal Association in 1953. See 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1620. The language of section 6(a) does not track the Model language exactly because the drafters also borrowed from provisions of the Alaska Constitution—language that they believed was "designed to be the broadest possible description" of the powers that the receiving units of local government may exercise. *Id.* at 1621. The drafters, however, expressly noted that such powers, broad and liberally construed as they may be, ultimately *must* relate to local concerns:

> "It is clear, however, that the powers of home-rule units relate to their own problems, not to those of the state or the nation. Their powers should *not* extend to such matters as divorce, *real property law*, trusts, contracts, etc. which are generally recognized as falling within the competence of state rather than local authorities. Thus the proposed grant of powers to local governments extends only to matters 'pertaining to their government and affairs.' " (Emphases added.) *Id.* at 1621-22.

See also *StubHub*, 2011 IL 111127, ¶ 19; *Ampersand*, 61 Ill. 2d at 540.

¶ 128    These very comments have been echoed by Dean Fordham, who, as noted previously, was the author of the Model Constitutional Provisions for Municipal Home Rule that was utilized by the drafters of our constitution: "It is perfectly plain that we do not want to devolve upon local government independent authority to enact private law. To have contract law or property law vary from city to city would be horrendous." Kenneth Vanlandingham, *Constitutional Municipal Home Rule Since the AMA (NLC) Model*, 17 Wm. & Mary L. Rev. 1, 17 (1975). As stated earlier, condominium law is a blend of real property law and contract

law, with aspects of corporate law added as well. It is clear that this is the very type of law that was intended by the drafters of the home rule article to fall *outside* the purview of section 6(a). For this reason, I conclude that the state has the traditional role in regulating this area. Just as the state has a traditional interest in regulating corporate record keeping and access, so it does with respect to condominiums, which are corporations under Illinois law.

¶ 129　　Thus, the underlying basis and goals of the Act and the debates that particularly address record keeping evince an intent by the legislature to impose uniform standards on condominium associations that are based on areas of property, contract, and corporate law. The City's ordinance does not pertain to its own government and affairs. The City, therefore, has overstepped its home rule authority.

¶ 130　　Today's decision has far-reaching implications for home rule jurisprudence. Under the majority's approach, all matters can be characterized as pertaining to a municipality's government and affairs, unless the legislature has taken affirmative action to deny or limit home rule power. Virtually any action by a home rule unit can be said to fall within section 6(a). The General Assembly would have to include express preemptive language to insulate against the reach of home rule, even in legislation relating to areas of law that the drafters of the home rule article never envisioned would fall within its domain. Given the drafters' intent, it is not surprising that the Act does not contain any "magic words" of express limitation since real property law, of which condominium law is a part, was never intended to fall within section 6(a).

¶ 131　　For all of the above reasons, I would conclude that the City's ordinance is unenforceable. Under section 19, plaintiff's request in 1999 for all of the board meeting minutes dating from 1980 through 1990 is invalid since an association is required to only keep minutes for seven years. State law requires financial books and records of account for the current year and the 10 immediately preceding fiscal years be produced, but "only for a proper purpose." I therefore would reverse the order of the circuit court and remand with directions that plaintiff's 1999 request be reviewed according to the provisions of section 19 and that all further proceedings be conducted in accordance with that statute.


¶ 132　　　　　　　　　　　　　　　　II. Attorney Fees

¶ 133　　While my position in section I of this dissent does not require that I address the attorney fees issue, I feel it necessary to do so given the result reached by the majority.

¶ 134　　The ordinance allows for those like plaintiff here to recover "his reasonable attorney fees." Chicago Municipal Code § 13-72-100 (2009). The import of this language is clear—a plaintiff can only recover the fees "he" incurred by hiring a lawyer. Reasonable fees are those that fall within the prevailing market rates in the relevant community.

¶ 135　　Plaintiff's attorney agreed to charge plaintiff $200 per hour for his services. Evidence revealed that the prevailing market rate in Chicago was $300. The $200 fee therefore was within the market range. There was no reason for the circuit court to increase the agreed-upon rate by $100, thereby awarding a windfall to plaintiff or his counsel.

¶ 136　　*First National Bank of Decatur v. Barclay*, 111 Ill. App. 3d 162 (1982), is directly on point. There, the plaintiff's attorney agreed to represent him in an action on a promissory

note at a rate of $70 per hour. The evidence revealed that the attorney billed plaintiff for 17½ hours. The circuit court awarded the attorney $5,000. The appellate court reversed the award, holding as follows:

> "The record supports an award for 17½ hours of the lawyer's time, billed at the rate of $70 per hour. To allow any greater award in this case, where the plaintiff and plaintiff's counsel had agreed upon this fee, would be to sanction an unjustifiable windfall for the plaintiff. The terms of the promissory note obligated the defendant to pay the reasonable attorney fees incurred during collection efforts. Here, it was error for the trial court to find that a reasonable fee exceeded the rate which the plaintiff agreed to pay its counsel in the case." *Barclay*, 111 Ill. App. 3d at 164.

The court remanded with directions for the circuit to enter a fee of $1,225 (17½ x 70). The same result should obtain here. The fee award should have been calculated using the agreed-upon rate of $200 per hour. It is wrong for the court to affirm the improper calculation.

¶ 137      Accordingly, not only have the collective members of the association here been denied the protections of section 19 in this case, they now have to pay plaintiff more money than he incurred in attorney fees. Given the importance of balancing the rights of individual condominium owners against the right of the association members as a whole, I urge the General Assembly to take action in this area.

¶ 138      JUSTICE BURKE joins in this dissent.